Please be seated. Your Honor, this is the second case in which we call the American Family Mutual Insurance Company v. Lobrow, on behalf of the American Family, Mr. Donald J. Hicks, Angelini Jr., and on behalf of the athlete, Mr. William Schneckenberg. Okay, gentlemen, are you ready to proceed? I am. Thank you, Your Honor. Mr. Schneckenberg. I have a special fondness for this building that we had sworn in here 28 years ago, and as I was approaching the building today, I realized that I had never in my 28 years saw a case that took more twists and turns than American Family v. Lobrow. Not always for a good reason, not always for a bad reason, but it was a case that just went so many different directions at so many different times. And as I proceeded through the case for the first year and a half, and I was the trial counsel and I was the attorney through the case for the entire proceeding, there was daily communication between counsel in this case. This was a case that something happened every day on. And as I proceeded for the first 18 months, I knew that I had him. I knew that I was going to win the case because I believed that the Lobrows had cooperated with the American Family Insurance Company. I knew that Ms. Lobrow had given them permission to enter the property, and I knew that their claim that they were proceeding on. Mr. Angelino, please discuss what the facts showed, not what you believe. And on that point, you're familiar with the Supreme Court Rule 341H, correct? Yes. And your statement of facts is to not be argumentative, and that you're supposed to support assertions that you make with citations to the record. Yes. And you understand that those are the rules, they're not just a guide. I understand. Okay. Okay. And I think the facts in this case show that for the entire period of time that we proceeded on this case, that the defendant, American Family Insurance Company, or the plaintiff, American Family Insurance Company, knew something that we didn't know. And what is that? They knew what the cause and origin of the fire was. Well, they certainly suspected it. Mr. Brown included in his original report that he suspected arson, correct? Correct. Yes. In his original report, which was prepared on March 10th in March 2010 and not given to us, he suspected that arson was the cause of the fire. Not only did he suspect that it was arson, but he had the actual machination of how it was going, how it was carried out. He knew that the drip leg, that the gas cap had been removed from the drip leg, causing a leak into the house of natural gas and that it was actually an explosion. So they knew that through the entire time period that we were litigating the case up until beyond two trial dates, up until the third trial date. So when are you saying you first learned of Brown's assessment that arson may have been the cause? I should say that the drip leg pipe with the water heater, the cap had been removed. When did you first learn? The first time that I knew that, that that was their opinion and that was his opinion, was when I took his deposition in October of 2011, which would have been two years after the fire occurred. When did the trial occur? The trial occurred in April of 2012. Six, eight months later? How long after? Correct, six months later. Okay. So where's the prejudice, I think? That's the question. Because there's actually two parts of the prejudice. The most critical part of the prejudice is when they believed they knew what the cause of this fire was and they allowed us to conduct discovery and to continue with discovery with their knowledge as to what the cause of this fire was, this drip leg and the explosion. You also had the fire investigator's report that said it was suspected arson, correct? Suspected arson. Initially, and that was early on. Well, that was in April of 2011. That was almost 16 months after the fire. There was never anything regarding the suspected cause of the fire for the first 16 to 18 months of the case. And the real prejudice in it is when you had that knowledge or when the American family had that knowledge that the drip leg was the cause of this fire, they allowed us to present our clients twice for depositions, each one of them. They allowed us to complete an inventory list. They did all of those things. And then I look back at it, and that's specifically why it was done. They specifically concealed their theory of the case to allow us to conduct discovery, to present them for their depositions, to present this inventory list without the knowledge that cause and origin was ever going to start the case. I see your point. I appreciate your point. You alluded to in October 2011 you completed your depositions in Brown, McGarry, and Eisenbach. Correct. At that point, it was obviously clear what their theory was. No question. So then did you seek to retain experts to rebut that? What happened in that 6 or 8 month period that you did that would ameliorate or eliminate any prejudice? I consulted with somebody. And that's not in the record, but I did consult with somebody. And what they basically said was it's too late. Can you please speak about what's in the record now, what you did or what you think? No, I understand. By that point in time, as I pointed out in our brief and I pointed out in our motions before Judge Ortiz, we were 2 years beyond the fire. We didn't have the same ability that American Family had because they had all the evidence. They had been inspecting it for 2 years. We didn't have the ability, the same ability that they had to inspect the fire. We were going to be going off pictures. We were going to be going off information that we had received from them. And that's a prejudice in and of itself. So the prejudice is if the trial had occurred sooner that you may have prevailed? Is that the prejudice? No. If they would have let us know, because they knew within 5 weeks of the fire, they knew that the gas gap in the drip lake was the cause and origin of the fire. They say that they had to confirm that. But that's what they knew. And by March of 2010, they for sure knew. If they had given us that information, we would have been much better prepared to have our experts go in to look at that evidence. When did you receive the information from Kane, Waukonas Fire and Rescue? I think Kane's first information was in April of 2011. So from November of 2009 or December of 2009 until April of 2011, we proceeded only on the duty to cooperate. When Judge Ortiz denied the motion for summary judgment in the mid-April of 2011, the American family filed 213 answers where identified Kane, who was the fire chief, and he said that he suspected that arson was a cause of the fire. Also, Brown was disclosed at that time, was he not? He was. The fire was intentionally caused based on his observations of irregular burn patterns in the residence, which were indicative, I believe he said, of the presence of accelerants. And that's about a year before the actual trial, wasn't it? Correct. But not only was that prejudicial to us, I think it was intentionally, that answer was intentionally given to us to mislead us that there was some type of cause and origin that had to do with the irregular burn patterns. When I saw that answer in our auditory in April of 2011, I thought it was crazy because this was an explosion. You know, he was talking about irregular burn patterns. It had nothing to do with this case at all. In fact, so it wasn't merely the fact that they had not provided us the information in 213. They provided us false information as to what they believed the cause and origin to be. Well, is it not fair to say, though, looking at this from an objective standpoint, that at that point, clearly you were on notice that they were going to contend this fire was not an accident, was not of some natural cause. This was caused by some act, deliberate act. Isn't that clear at that point? No. In some respects, they did put us on notice. But if you look at the answers from April of 2011, August 1st of 2011, and even October of 2011, there was never an opinion that tied in what their belief was as to the cause and origin of the fire to the actual fire itself. So they gave us information that Cain suspected arson. They gave us information that Brown saw that there were potentially, you know, accelerants. But they never gave us the opinion that this cause and origin was related to a gas gas. Now, I think you can in some realms keep your theory of the case close to the vest. But I don't think you could use 213F3 as your accomplice. Not only defensively, you can't put in an answer that talks about burn patterns when you know that this was an explosion and it was the insured removing the gas cap from the drip leg of his own water heater that was the problem. And, you know, I'm presenting all my people for their depositions. If I would have had that information, I would have been able to not only use it in the defense of my case, but I would have been able to more accurately and more properly retain experts who could have refuted that evidence. Let's move to another issue. I think the other critical issue is the denial of coverage alleging that there was some fraud that was committed here. Correct. And part of the husband and wife. So how do you get around that? You know, the fraud argument is a good argument for the American family as it goes to the husband. I think what they said was that the husband had made certain allegations in the course of the investigation where fraud was. My argument was is that it was all after they filed the case and was all during the pertinent during the part of litigation. It wasn't in the claim process. The normal claim process is fire proof of losses filed within 60 days. Somebody files a declaratory action, whether it's the insurer or the insured, and they find it out in this case because they filed within two weeks of the fire to get into the house, which was the declaratory action or the chance reaction to get into the house to gain permission to access to the house. What they should have done is once they gain access to the house, they should have dismissed the case, allowed the proof of loss to be filed and then litigated from then on. What they did was they filed a second count, which alleged lack of cooperation. And we proceeded on that for a year and a half. So you're saying the personal inventory was not comes in under a different theory. It does. You know, I personally nothing is a proof of loss other than the proof of loss. And they lost their ability to have us file a proof of loss when they filed the complaint and made it all about the lack of cooperation. And that was actually argued before Judge Ortiz that you're not required to file a proof of loss if they're proceeding on something completely different. I'm sorry. You argued that the inventory list and depositions can be considered the equivalent of sworn statement and proof of loss, correct? It's the equivalent of it. It could be their. And I was referring to cooperation. Now you're changing your position to say that the inventory list is simply an item of evidence with no connection to the policy requirements. That's and it doesn't stop apply. No, I think what I was referring to was in the area of cooperation. When they were saying you didn't cooperate, you didn't cooperate, you didn't cooperate. I said, hey, we sat for depositions. We gave them a full inventory list. That was cooperation. But it's not a. It's an argument of cooperation under the policy. Correct. Correct. I was arguing about cooperation under the policy. I'm saying that what made this a case different from any other was the fact that there wasn't the normal claim process where they would attack our proof of loss. And, you know, and since a proof of loss was never filed, everything was in litigation. In fact, during the course of the litigation, they never asked for a sworn proof of loss of all the things they asked for. And it was in my brief and on the record in the course of their production request, they never asked for proof of loss. So we never gave them proof of loss. We were in litigation. And all of the statements that either were made by Miss Lowbrow or Mr. Lowbrow were also in the course of litigation. And the Tarzine case and then the cases that they talked about were this fraud argument is really for the non-adversarial process of the claims process. It's for the settlement period. It protects the insurer during the settlement period so that if anyone makes a fraudulent statement during the settlement period, they could use this to exclude the policy. In this case, we were beyond the settlement period. We were in litigation. Assuming that to be the case, what about this lease? The trial judge specifically found there was fraud in the tendering of this lease, claiming amounts that they were paying for rent. And there was two different documents that did, I think you'd have to acknowledge, show a discrepancy in the amount of the rent. What do you make of that? Correct. That lease was Mr. Lowbrow that had signed that lease, and that's what I was referring to as to the allegations of fraud as it applied to Mr. Lowbrow and the lease. Again, that evidence, again, came out in discovery, and it was a little bit unusual because of all of the things that I asked for. I asked for the entire claim file for that lease. I asked for the entire claim file. That lease was the only thing that was not in the claim file. So the first time I saw that lease was at trial. And that was my whole thing with American Family is I always saw everything right at trial, right at the hearing. And I think it was just further evidence. But then it was on the merits. You can see there was a discrepancy in the documents. Yes. Can't they use it as evidence to say that there was a misrepresentation? I think, again, because they filed so quickly and because they didn't allow it to be done during that settlement period, during that non-adversarial process, I think they denied their ability to prevail on that fraud count. I really do. I think it was a cause-and-origin case. I didn't know it was a cause-and-origin case for 18 months, but I think that's what it was. The other thing, if I could just, because I don't have much time, is to address the innocent-insured doctrine. And, you know, when you see the case of Aurelius, immediately you look at him like, oh, my God. It's one of those, oh, my God, cases where you really don't know if you can distinguish that case from any other case. And I think it is clearly distinguishable. The other cases had almost identical language to the language that was in the policy, that was the specific policy, the American family policy. And that language really basically stated that we do not cover any loss or occurrence in which any person has concealed or misrepresented any material fact or circumstance. That was in Wasik. Also, in Maselli, the entire policy shall be void if any insured has intentionally concealed or misrepresented any material fact. Aurelius was different because what Aurelius did was it stated the policy is void as to you or any other insured. Aurelius was the only case and the only policy language that specifically set forth who the policy was void for. All of the other cases stated the policy is void if there's any concealment of misrepresentation of fact by any insured. And we always have to remember that there were always two losses here. There were two claims. There was Bogomila's claim and there was Andrade-Lobra's claim. And they always proceeded and they always had individual rights towards those things. So I think the Innocent Insured Doctrine presupposes that. In order to have an Innocent Insured Doctrine, you've got to have two people who have claims. In this situation, Aurelius was the only case to specifically set forth to which party the contract was void. And that's the difference between Aurelius. And if you look specifically at the language in our policy, all the American family would have had to do with the concealment of fraud was state And here's how it states originally. With respect to all insureds, this entire policy is void if before or after the loss there was a misrepresentation of fact. By any insured? Excuse me? By any insured? No, it states with respect to all insureds, this entire policy is void if or before any insured has. They're referring to any insured, whether it's Bogomila or it's Mr. Lobra. But what it doesn't state, what Aurelius states, this entire policy as to you or any other insured is void. So what my interpretation of that language is, you both have your proof. You both have your loss. You both have your claim. If you have a claim, and any insured, which would be you, you're any insured, if you make a material misrepresentation of fact, that policy is voidable as to you. And that's how Masselli interpreted it. That's how Salemi interpreted it. But in Aurelius, they specifically set forth as to you or any other insured. So it imputes the misrepresentation of fact to the other insured. And they don't, okay. Let's, accepting your argument, what about the trial court's findings regarding Bogomila? Okay. That's a critical part. Yeah. I mean, assuming that you're correct, whether we agree or disagree, how do you get around a trial court's finding that she engaged in fraud and misrepresentation? And the point was, because that's critical. The standard of proof? Correct. Again, during the, whatever she did, and let's say that, and the findings weren't, I mean, this was a long trial. There was a ton of evidence that was taken in in this trial. And he really pointed to one thing, which was the overinflation of the inventory list. As well as the lease, the lease. Yeah. But she didn't negotiate that lease. The evidence was that was her husband, but she was a party to it. Okay. Whether she had negotiated it or not, she was a party to it. But all of that evidence against Bogomila was in the course of discovery. The inventory was conducted and submitted in the course of discovery. And it was critical because they knew what the case was about, and we didn't. Well, you can keep saying that. The record concerning the loss, the inventory, the trial court's looking not just at her statements, but all the evidence. I mean, the place was emptied out, essentially. And, you know, isn't it a fair inference that the trial court didn't, you know, he's looking at both parties and that they were both engaged in this conduct in making that determination? Yeah, I would agree to that, but that's not the ruling he made. In fact, he found that she wasn't complicit in the fire. Okay. He found that she engaged in fraud with respect to the lease and the inventory list. Correct. Correct. And we disagreed with him. And he was a great judge. I mean, the one thing about Judge Ortiz, and he listened to everything, and I thought he was a terrific trial judge. I just think he enabled them through the entire process to use 213 to our detriment. And I think it was critical to us, and I think at the end of the day, that's what fell on us. Thank you. I have one additional question for you. Sure, Judge. And I apologize for going back to your second issue. What is unique about a proof of loss statement that you think is necessary that it be filed in order to prevail or to proceed on a fraud count? Because as the Tarzan court ruled, the trial is the show of evidence. It's not the prove your evidence. And there's a quote in there that they quote, like an 1878 case, is that it's the opportunity to present your issue of fraud. It's not your opportunity to create it. So I think it's that non-adversarial period, that settlement period, that's so critical to this case, and it's the period we never had. And I don't think you could go forward with your fraud count based upon things that happened during the course of discovery. We were in a completely adversarial position at that time. There were attorneys. It was everything. So your point is you can't just rely on statements that are made during the 60-day settlement period, that this is negotiation, this is recollections, and you start putting pieces together. If someone asked me today to list everything in my house, it would take me a while. Correct. So I get that. So your point is that until it's reduced to a formalized proof of law statement, it cannot stand as the allegation for fraud. Is that your position? That is my position. Okay. Okay. Anything else? Thank you. You'll have a chance for reply. Thank you. Counsel, do you wish to offer an argument? Yes, Your Honor. Bill Sneckenberg on behalf of American Founder, Mr. Angelini. Judge Ortiz, in trying this case, listened to the evidence and ruled accordingly, and his rulings are not against the manifest way to the evidence. He also managed this case pretty much from its inception, and there's nothing that he did to abuse his discretion in the management of this case. This case started out as a fairly adversarial problem right off the bat because of the access issues to find out what caused this house to explode with the ensuing fire. Even the officials in the village of Wakanda had difficulty getting access to the premises. To get access, American Founder was forced to file a lawsuit, and also they challenged the Labrose failure to give a recorded statement, execute certain documents which would allow them to investigate this. After that, the court granted the relief to get access to the premises, and the access was granted. It's very clear that contrary to Mr. Angelini's argument, Mr. Philip Brown did not have an opinion within a reasonable degree of scientific certainty that the missing drip cap caused this fire and explosion. He wanted it to be looked at by engineering to determine whether it had come loose during the explosion, as a result of the explosion, whether it had been disrupted by an abnormal influence of gas into the premises, whether there was leaking gas, all issues which were beyond his expertise. What about the argument that American Family essentially sat on the initial opinion, and the defendants had to litigate without knowledge that they were going to later on assert a claim that the explosion and fire were due to arson? Well, procedurally, let me give you some background about that. It took six months for us to get an answer to the complaint that was initially filed, after we filed a motion to default. Then it took another six months to get discovery, written discovery, complied with. The depositions of Mr. and Mrs. Lebrow didn't go until November of 2011, virtually a year after this explosion. 2010, I'm sorry. In January, a motion for summary judgment was filed on the question of cooperation. It was that simple. There was a disclosure date for experts that was due in April. The motion was pending, argued, and then decided after that date had passed. American Family, on April 27th, made the disclosures. They disclosed Lt. Cain from the Wakanda Fire Department said this was an intentional fire. They disclosed Philip Brown, who said because of the irregular fire patterns, this was an intentional fire. They knew at that point in time that there could well be this issue of an intentional act as a breach of this contract. In fact, after Judge Ortiz denied the motion for summary judgment, American Family sought leave to file and amend the complaint. Mr. Angelini received the rights to file a counterclaim, and affirmative defenses were made to that counterclaim, raising the cause and origin of intentional exclusions in the policy. I don't see anything procedurally wrong with the way that happened. But in April, they knew, and this is what Judge Ortiz said in his rulings, that he found no surprise or prejudice because they were well aware that in April, there was going to be this issue of cause and origin. And then in June, it became obviously apparent after the counterclaim, the affirmative defenses were applied along with the amended complaint. This is about nine months before the trial? What's the time frame? That would have been April. The trial, I believe, was in the following April, a year, pretty close to a year. And then the thing about the argument that there was a deliberate concealment, I don't think there's any evidence to support that. Not only did Mr. Brown need this engineering expertise to draw the final conclusions that he needed, if he was going to say that this cap was voluntarily removed and that wood was put into the piping to cause a slow leak of gas to get to the point where it would explode, he needed engineering help because he's not an engineer. He got that in August when Mr. McGarry, Mr. Erlenbach, Mr. Juergens, Juergens was on electric, he eliminated all the electrical. Erlenbach was a gas expert. He said the normality of the gas, there was nothing abnormal about the gas going into that house. And then McGarry was the materials expert who had to examine the piping and the appliances to see whether or not this cap had been moved voluntarily or had been blown off. He did this with microscopic examination. There was no destructive residue. Your argument is that clearly, based upon that presentation, there was no abusive discretion by the trial court in denying their motion. Absolutely not. Actually, Judge Ortiz was sympathetic to the argument that this would cost them a lot of money to have to deal with these cause and origin issues. And he gave them 90 days. And, of course, the trial didn't occur until 90 days after that, and 90 days had elapsed. So there was plenty of time for counsel to do something from an expertise. Now, he argues to you that the physical evidence, he needed it and he needed more time to examine it. Well, the physical evidence was always available. It was always available. All the piping, the water, hot water heater, the furnace, that was all available for an expert to look at during that six to nine month period after the disclosure of these opinions. Would the premises have changed at all? He seems to be arguing that you're hearing prejudice that, you know, now here we are two years later and perhaps, you know, things are not the same as they were right after the fire. Is that argument viable at all? I don't believe so because there's two elements to that. First, there's the scene itself. He was given an opportunity or his client was given an opportunity to have an expert there when it was examined in late December. They didn't take advantage of that. All of the physical evidence that was associated with the gas cap, including all the piping and all the gas pipes, that was taken into custody by Mr. Brown and warehoused. So you're saying your ability to challenge that wouldn't have been impaired or hampered? It was not impaired. It was the same way as taken out. Mr. Brown took possession of that in April of 20... No, he took possession after the initial examination in December of 2010. No. The fire was in 09, wasn't it? The fire was in November of 09. He took possession December 28th of 09. A month later. 09-ish. A month later. Less than a month, yeah. Okay. Right. What do you make of the innocent insured rule? Because that's an overarching, you know, issue here, potentially dispositive of some of the issues of the case. Right. Actually, I was involved with creating that rule to a certain extent because I was the attorney in the Maselli case. And that rule came about because the language and the policies back when Maselli was in some of these other cases were being decided, dealt with this question of the insured. If the insured commits fraud, false swearing, there's no coverage. But the key word was the insured. That was the key word. And that changed over time because as soon as the insurance industry recognized that the insured could encompass a lot of different people who would not necessarily understand that their claim would be barred by the acts of another one, they changed the policies in this state. They changed it and added all insurers. And that's exactly what this policy states. It is no different than the Aurelius policy in that respect. It unequivocally states concealment or fraud with respect to all insurers. This entire policy is void if before or after the loss, any insured has an intention to conceal or misrepresent any material fact. I don't know what could be more clear and unambiguous, and that's what Judge Ortiz found. And even if the judge misread it, your argument is there was still proof of fraud by Borgmiller. Yes. On the lease, sir, what are you alleging he committed the fraud on? Well, Judge Ortiz found that she committed fraud not only on the personal property but the lease, because she signed the lease that indicated that the rent was $2,500 when in fact it was $900 and some dollars. Okay, so he found that. And procedurally now, he decided this case the way that the pleadings were outlined. The first, the plaintiff's case. Count one and two he found against American family. Count three, dealing with the misrepresentations of both LaGroves on the rent and the personal property. And he found against them on that. Now, I submit to the court he didn't have to go any further if he concluded that the innocent insured rule did not apply because of the policy language. But he went further. He concluded based upon their counterclaim that they were not entitled to recover under a counterclaim because the insurance company had established their exclusion that this was an intentional act. All right, so in essence, his answer to the argument of counsel was even if the policy language doesn't bar your counterclaim, I specifically find specific fraud that would bar the recovery. That's correct. And then he says to which then he has an ultimate trump card. He then says, well, wait a minute. Isn't there a difference, his theory is, between giving an inventory in litigation and giving it in investigation? Therefore, you shouldn't use that against them in fraud. To which you say what? This is an unusual approach to this. But I don't think that it violates any of the existing procedural requirements on insurance companies. Because here the issue first was not giving us a recorded statement, not providing a proof of loss. Then it evolved into you breach the policy. Now, Judge Ortiz and the parties understood that this process of the claim was proceeding even despite litigation. Which Mr. Angelini acknowledges there was constant communication between he and the insurance company that wasn't just regarding litigation. It was regarding processing the claim. Correct. And that argument that was made and accepted by Judge Ortiz in denying our motion for summary judgment on the cooperation claim. And in my view, that's fundamentally improper appellate practice to make that argument now. It should have been made below. But he couldn't make that argument below. Because if he had, there was no recorded statement. There was no proof of loss. And in terms of Judge Jorgensen's question about the proof of loss, and I can't cite a specific case off the top of my head. But this question of whether somebody has substantially complied by filing a proof of loss, which is not in the form required by the insurance company, has been decided by an appellate court. And I'm sure I can get that side if the court wants to see it. But the fact of the matter is, has there been substantial compliance? Not necessarily a proof of loss form required by the insurance company. And in this case, Judge Ortiz denied our motion for summary judgment based upon the inventory because he felt that there was substantial compliance, that that was the proof of loss. And that's exactly what Mr. Angelini argued to him. And he argued to him that the depositions, the three-hour depositions, were equivalent to the recorded statement. Therefore, there's no prejudice, and they have complied with what the preconditions of the policy required. I don't think that Mr. Angelini can come before this court and argue otherwise. I think the question then becomes, is that substantial compliance, whatever it is, whether it's a proof, well, I don't want to use that word. If it's a document that says, look, here's my inventory or it's my answers under questioning during a deposition or any statement, is that enough to form the basis for a fraud count?  Because? Because the Tarzanian case doesn't apply, nor does the precedent that it relies upon apply, except where an insurance company tries to raise fraud at trial because of something that the insured said at trial. I can say for some certainty that in researching these issues, especially this issue, I don't think that a court in Illinois has really addressed the question that Your Honor has put to me once a lawsuit's been filed and short of a trial. But were the parties agreed that this is the procedure in which they're going to undertake this piece of litigation, I don't think the court should say that it's improper. Were the parties that did that? So you're saying then that if the parties agreed that this lower threshold, what you're saying was substantial compliance, that that is enough to generate fraud, rather than saying this unique document, this specific animal called a proof of loss, with all its accoutrement, must be filed in order to generate a fraud count? Two different theories. Cooperation. Right. That's what... I'm done with the cooperation. But in this case, what I meant was that that's all that was filed here. Correct. But substantial compliance has nothing to do with whether there's been fraud. Right. But all I mean is there was no proof of loss here. That would be complete cooperation. If they'd filed... We didn't believe that they cooperated by giving us proof of loss. Let's set that aside. But if they had filed a proof of loss... Okay. That then, in the normal course of cases, does seem to form the basis for fraud. Correct. My question is, when you don't have that, presumably what was filed here, and correct me if I'm wrong in my supposition, but what was filed here is a lesser something than a proof of loss. And how far down that chain do we go and still say that's enough to form a fraud count? When the insurer says that's equivalent to a proof of loss. Okay. And so you think that's the difference here? That is the difference here. Okay. Okay. That makes sense. Okay. Thank you. I'm sorry, counsel. I didn't mean to use all your time. Did you have any additional questions? No. I will give you a chance if you want to make a final remark, because I did use all your time, and I apologize. My final remark is I think Judge Ortiz tried a terrific case. He did not abuse his discretion in how he handled this. He managed it wonderfully, tried to do justice for everybody. And as a trier of fact, he found there was fraud, and that's not against the benefits of the evidence. Thank you. Counsel, do you wish to reply? Yes. Just to clarify, when counsel stated that he was the attorney, in the Maselli case he was, and it wasn't a change of the word thought to any. The any was in the policy well before Maselli, Salami, or Wasik. It referred to any insurer. What wasn't in Maselli, Salami, and Wasik was to whom the policy is void. And that's where the difference in Aurelius. And Aurelius said the policy is void to you or any other insurer. So it wasn't like it was corrected in Maselli and the insurance companies after Maselli and Salami went and corrected that. The language any insured was in all of those cases. And if you look specifically at the Maselli language, it's almost identical to the American family language, almost identical. It refers to the entire policy. It's void, and it speaks about any insurer. The other point is that he was completely wrong in his allegation that Mr. Lowbrow and Ms. Lowbrow were sued because they hadn't filled out a proof of loss or they hadn't given a recorded statement. The proof of loss wasn't even due four or five weeks after the filing of this case. I think he was talking about the lack of access. He was talking about the lack of access. But then he went on to state it was the Lowbrows were sued because they didn't cooperate. They didn't file a recorded statement. They didn't give a recorded statement. And they didn't file a proof of loss. And they were sued because they didn't provide a proof of loss. The proof of loss had to be filed within 60 days of the filing. They sued them within 40 days or within 22 days of the filing. So the proof of loss could never have been filed. But the argument I made in cooperation that the equivalent, and somehow I'm barred from arguing that because I said the deposition is the equivalent of the proof of loss, there were several arguments that were made regarding the proof of loss. One was that a proof of loss is not required when an insurer takes on its, you know, it doesn't become an issue in the case. The filing or the lack of filing of the proof of loss is not an issue. In this case, that's exactly what happened. Cooperation was the issue that was filed in this case. And Judge Ortiz, there was a motion specifically on it. If you look at his ruling on specifically on that proof of loss issue back in April of 2011, it was also argued that there was no requirement for us to file a proof of loss because we were already in litigation. So it was more than the fact that we said we gave them the equivalent of the proof of loss. It's not just what Judge Ortiz said. It's the positions that you took in the trial court vis-a-vis the position you're taking now. Do you understand? I understand. Yeah. I mean, his estoppel argument has some merit because you can't take, regardless of what the judge found, you can't take one position in the trial court with respect to the policy and argue something different here before us. That's the argument. I think I mean, and I did that in the trial court level, too, after the trial. And I don't think they're different. I really don't. I don't think that I've stopped from taking that position. You know, what I said was it may not have been a proof of loss, but they cooperated. They gave it that position. It wasn't this is the equivalent of a proof of loss. It's we cooperated. You're looking for that proof of loss. We didn't give it to you because you sued us. And then we cooperated and we gave the deposition. And we gave you the documents and we gave you the inventory list. They're not the equivalent of a proof of loss, but you know what? If you look at it in theory, it's really kind of the same thing. We're cooperating. So for those reasons, we think that the decision of Judge Ortiz, as good a judge he is, and he was an excellent judge throughout the trial, I think there was a certain enabling that went on. And I just think that we were so prejudiced by not knowing that they knew that it provided us the opportunity to have a fair trial. So thank you very much. Thank you. The decision in due course. We are in recess until 10th.